**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CYNTHIA A. ALTLAND,** | : | **Civil No.  1:22-CV-1069** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Cynthia Altland's Social Security appeal calls upon us to consider longstanding principles regarding the duty of an Administrative Law Judge (ALJ) to fully articulate the basis of a residual functional capacity (RFC) assessment, particularly in a case such as this one, where the case was remanded specifically to obtain additional evidence and for further evaluation of the medical opinion evidence and the plaintiff's overall physical residual functional capacity.

Cynthia Altland asserted that she was disabled due to a number of impairments, including degenerative disc disease in her back, knee replacements,

1

diabetes, lumbar canal stenosis, joint pain, and morbid obesity.[1] In the initial decision denying Altland's disability application, an ALJ gave great weight to a state agency medical opinion, which opined in 2017 that Altland could perform work at the light exertional level with additional postural and environmental limitations.

This decision was ultimately remanded by the United States District Court for the Middle District of Pennsylvania, and the Appeals Council directed the ALJ to hold supplemental proceedings and obtain testimony of a medical expert regarding Altland's limitations from her physical impairments. Specifically, the order vacating this decision noted that the ALJ relied on this 2017 state agency opinion, and that Altland had further treatment after this opinion was rendered, including a left knee replacement and treatment for osteoarthritis and fibromyalgia. Thus, the Appeals Council ordered the ALJ to consider this after acquired evidence, in addition to obtaining testimony from a medical expert.

On remand, a different ALJ held two supplemental hearings in February and August of 2021, and Dr. Kweli Amusa, M.D., testified as a medical expert after reviewing Altland's records. Dr. Amusa testified that Altland would be limited to

_____

[1] Altland initially filed her disability application in January of 2017. She filed a subsequent claim in November of 2019, and upon remand of the initial claim in October of 2020, the Appeals Council ordered her applications consolidated. (Tr. 2225).

sedentary level work with additional postural limitations, including that Altland could never crouch or crawl, and that she would be absent from work at least two days per month. (Tr. 2106, 2147). A vocational expert who testified at the August 2021 hearing stated that two absences per month would preclude all work, and further, that a limitation to never crouching would eliminate Altland's past work as a Human Resources assistant. (Tr. 2112-13). Thus, the evidence obtained in this hearing appeared to support Altland's claim of disability.

Nonetheless, following these hearings, the ALJ denied Altland's disability application at Step 4 of the sequential process governing these claims, finding that she could perform her past work as an HR assistant. The ALJ found that Altland was limited to sedentary level work with occasional postural limitations but did not adopt Dr. Amusa's findings that Altland could never crouch or that she would be absent two days per month. Instead, the ALJ gave significant weight to the 2017 state agency opinion and gave Dr. Amusa's opinion only partial weight, reasoning that Dr. Amusa's opinion was not supported by objective examination findings in the record. The Appeals Council denied Altland's request for review.

Thus, what we are presented with is a decision denying Altland's application which gave significant weight to an opinion that this Court and the Appeals Council previously found did not take into account a large portion of Altland's records, and

gave only partial weight to an opinion that took into account all of Altland's medical records. This decision does not adequately explain the ALJ's reasoning for affording these various opinions the weight she afforded them; rather, the ALJ simply reasoned that Dr. Amusa's opinion was overly limiting and not supported by the record which contained references to normal physical examination findings.

In our view, more is needed here. Specifically, we find that the ALJ in the instant case failed to adequately explain her reasoning for affording the 2017 state agency opinion, which was the focus of the District Court and Appeals Council remand, significant weight, while only affording partial weight to Dr. Amusa's opinion, which took into account the entirety of the medical record. Accordingly, because we conclude that the ALJ's burden of articulation has not been met in this case, we will remand this case for further consideration by the Commissioner.

## II.   Statement of Facts and of the Case

On January 26, 2017, Cynthia Altland applied for disability insurance benefits, alleging an onset date of October 14, 2015, which was later amended to September 8, 2016. (Tr. 10). Subsequently, Altland filed a second claim for disability benefits and supplemental security income on November 14, 2019, which was then consolidated with the first application on remand. (Tr. 2225, 2372). Altland alleged that she was totally disabled due to a host of impairments, including

4

degenerative disc disease in her back, knee replacements, diabetes, lumbar canal stenosis, joint pain, and morbid obesity. (Tr. 48-49, 2188-89). Altland was 55 years old at the time of the alleged onset of her disability, had a high school education, and had past work as an HR assistant and a data entry clerk. (Tr. 17, 48, 2071).

With respect to these physical impairments, the medical record revealed the following: Altland treated for knee pain and back pain throughout the relevant time period. On this score, Altland complained of left knee pain. (Tr. 230). She reported having some relief with past injections, and that she had been scheduled for a knee replacement, but it had been cancelled due to her losing her job and her insurance. (Id.) On examination, she exhibited an antalgic gait and knee effusion. (Tr. 231). Around this same time, Altland treated with York Adams Pain Specialists, where she received steroid injections for her lower back and knee pain. (Tr. 482). Again, she exhibited an antalgic gait on examination, and it was noted that her musculoskeletal movement was restricted in all directions. (Id.) She received an injection on January 28, 2015. (Tr. 484). An MRI of her thoracic spine in May of 2015 showed mild central spinal canal narrowing. (Tr. 495). In June of 2015, following a neurosurgical consultation, it was recommended that Altland try epidural steroid injections for her back pain. (Tr. 245).

5

Treatment notes from June of 2016 revealed that Altland was continuing to complain of bilateral lower back pain radiating into her legs. (Tr. 524). At that time, she was treating with physical therapy but reported that her pain is worse in her knees and giving her more pain in her back. (Tr. 525). On physical examination, Altland exhibited an antalgic gait and restricted musculoskeletal movement in all directions. (Tr. 528). At that time, she received another injection. (Tr. 530-31).

Ultimately, in October of 2016, Altland had her right knee replaced. (Tr. 621). An X-ray of her knees in November of 2016 showed a prosthesis in her right knee in good position post-knee replacement and showed advanced degenerative changes in her left knee. (Tr. 577). At this follow up appointment, Altland reported good improvement since her knee replacement. (Tr. 560). However, in December of 2016, Altland presented in mild to moderate distress with an antalgic gait and globally diminished lumbar range of motion on examination. (Tr. 540).

Treatment notes from February of 2017 indicated that Altland was continuing to experience bilateral lower lumbar pain that radiated to her legs. (Tr. 544). She reported only 25 percent improvement since an injection in December of 2016. (Id.) She stated that she had not been doing much activity since her knee replacement, and that both her left and right sides were bothering her. (Id.) She exhibited an antalgic gait and globally diminished lumbar range of motion on examination. (Tr.

546).   Consequently, in July of 2017, Altland had her left knee replaced, and afterward complained of difficulty walking and muscle weakness. (Tr. 1247). She was discharged and it was recommended she start physical therapy. (Tr. 1260).

In February of 2018, at a chiropractic appointment, Altland complained of sciatic pain down her left leg with lower back pain. (Tr. 1508). It was noted that Altland complained of pain or discomfort in her left leg upon extension, flexion, and rotation. (Tr. 1510). She also had a positive straight leg raise on her left side with pain. (Tr. 1511). A treatment note from March of 2018 indicated that she was doing well after her bilateral knee replacements but was experiencing left hip pain radiating to her knee. (Tr. 1515). In April, it was noted that Altland had osteoarthritis of the knee and fibromyalgia, but she exhibited normal strength and range of motion on examination. (Tr. 2019, 2542, 2544). Subsequently in October, Altland presented with bilateral lower back pain following an injection. (Tr. 2644). It was noted that Altland experienced 80 to 85 percent improvement following her last injection but the pain started to reoccur. (Id.) On examination, Altland exhibited an antalgic gait and globally diminished lumbar range of motion. (Tr. 2646-47). At an appointment in February 2019, Altland complained of right hip pain, and she exhibited mild stiffness and discomfort with hip flexion and rotation. (Tr. 2754). At this time, it was noted that she was happy with her knee replacements. (Id.)

7

At a March 2019 follow up with her primary care physician, it was noted that Altland exhibited trace bilateral edema on musculoskeletal examination. (Tr. 2562). She continued to receive injections, but she reported that she was experiencing weakness in her bilateral legs and pain into her right groin and thigh. (Tr. 2650). She also complained of bilateral lower back pain radiating to her knees. (Id.) On examination, she had an antalgic gait and diminished lumbar range of motion. (Tr. 2652). In June, Altland exhibited trace edema in her lower extremities. (Tr. 2620). Treatment notes from September of 2019 indicated she had a normal range of motion in her right and lower extremities. (Tr. 2700). However, around this same time, Altland presented to pain management complaining of the same bilateral lower back pain but also right hip and groin pain. (Tr. 2656). Treatment notes from this visit indicate that Altland was taking Advil because she has reactions to many other medications, and that she was not sure whether to continue with injections at that time. (Id.) She complained of muscle weakness in her lower extremities, and on examination, she exhibited an antalgic gait and diminished lumbar range of motion. (Tr. 2659). She was started on Gabapentin. (Tr. 2660).

Throughout the remainder of the relevant time period through 2021, Altland continued to treat for her lower back and lower extremity pain. Thus, in November of 2019, X-rays showed mild degenerative changes of her hip joints, and it was

8

recommended Altland start physical therapy. (Tr. 2744, 2748). She was also diagnosed with atrial fibrillation in November of 2019. (Tr. 2734). In early 2020, her physical examinations were relatively normal, with findings of normal musculoskeletal range of motion and no tenderness. (Tr. 2882, 2947, 3416). However, a CT scan in May of 2020 indicated severe spinal canal central stenosis at L4-5 and severe degenerative disc disease at L5-S1, a June 2020 X-ray showed mild degenerative changes of the thoracic spine, and an X-ray in August of 2020 showed mild multilevel degenerative changes of the lumbar spine. (Tr. 2957, 2975, 3074). In addition, treatment notes from March of 2021 indicated that Altland had lower extremity edema. (Tr. 3619).

Additionally, and throughout the relevant time, Altland's treatment records consistently recorded her morbid obesity, as she stood 5 foot 6 inches, weighed roughly 300 pounds, and recorded a BMI between 50-59.9. (Tr. 245, 258, 333, 472, 602, 701, 864, 989, 1120, 1140, 1520, 2948, 2954, 2985, 3084, 3091, 3100, 3126, 3134, 3153, 3164, 3293, 3310, 3414).

It was against this clinical backdrop and upon remand from the District Court and Appeals Council that an ALJ conducted two supplemental hearings regarding Altland's disability application on February 17 and August 4, 2021. (Tr. 2084-2116, 2117-55). Altland, a medical expert, Dr. Amusa, and a vocational expert appeared

and testified. (Id.) In her testimony on February 17, Altland described the severity of her physical impairments, stating that she could not sit or stand in one place for very long due to her back pain; that she experienced pain in her knees and hips because of her osteoarthritis; that she used a cane to get around her house; her husband helped her with household chores, such as carrying the laundry and cooking; and that it took her some time to get herself bathed and dressed. (Tr. 2129-35).

Dr. Amusa also testified at this hearing after reviewing Altland's medical records. On this score, Dr. Amusa stated that the record contained evidence of severe degenerative disc and joint disease, and that she had both knees replaced. (Tr. 2138). Dr. Amusa testified that the records indicated Altland's rheumatologist had labeled her musculoskeletal condition as fibromyalgia. (Tr. 2145). Dr. Amusa opined that Altland could lift no greater than 10 pounds occasionally; could stand and/or walk only 2 hours in an 8-hour workday; could never climb ladders, ropes, or scaffolds and could never crouch or crawl; and she could only tolerate occasionally exposure to temperature extremes and respiratory irritants. (Tr. 2147). At the August 4 hearing, Dr. Amusa further testified that as of September 2019, Altland was limited in reaching overhead occasionally, and that she would be absent two times per month. (Tr. 2105-06). At this latest hearing, a vocational expert testified that if an

10

individual were limited to never crouching, the claimant's past work as an HR assistant would be precluded, as that job required occasional crouching, and that two absences per month would result in an individual being unemployable. (Tr. 2112-13).

Following this hearing on December 20, 2021, the ALJ issued a decision denying Altland's application for benefits. (Tr. 2059-72). In that decision, the ALJ first concluded that Altland satisfied the insured status requirements of the Act through September 30, 2023, and he had not engaged in substantial gainful activity since her alleged onset date. (Tr. 2061-62). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Altland suffered from the following severe impairments: chronic obstructive pulmonary disease ("COPD"); degenerative joint disease of the bilateral knees; degenerative disc disease of the lumbar and thoracic spine; coronary artery disease; atrial fibrillation; bursitis of the hip; and morbid obesity. (Tr. 2062). The ALJ found that Altland's depression and anxiety were nonsevere, and her fibromyalgia was not a medically determinable impairment. (Tr. 2064). At Step 3, the ALJ determined that Altland did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 2065-66).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Altland's limitations from her impairments:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally lift and/or carry up to twenty (20) pounds and frequently lift and/or carry up to ten (10) pounds; can stand and/or walk for two (2) hours and sit for six (6) hours in an eight (8) hour workday with normal breaks; can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch, but can never climb ladders, ropes, or scaffolds or crawl; must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards (such as unprotected heights and machinery).

(Tr. 2066).

In reaching this conclusion, the ALJ stated that she considered the medical records, Altland's subjective complaints, and the opinions of several physicians. On this score, the ALJ considered the April 2017 opinion of state agency consultant, Dr. Munkberg, M.D., and gave this opinion significant weight. The ALJ reasoned that this opinion, which limited Altland to light work with occasional postural limitations, was based on the medical evidence at the time it was rendered, and also consistent with objective findings following Altland's knee replacements. (Tr. 2069-70). The ALJ also stated that she had considered evidence in the record since this opinion had been rendered. (Tr. 2070).

The ALJ also considered the 2021 opinion of Dr. Amusa, which limited Altland to less than sedentary work, but gave this opinion only partial weight. (Id.) The ALJ reasoned that this opinion was overly limited and not supported by normal objective physical findings, such as intact upper and lower extremity strength, normal gait and stance, and normal mental status examinations. (Id.) However, the ALJ did not explain how this opinion, which was rendered in 2021 and was the only medical opinion discussed[2] that was made with the benefit of the entirety of the medical record, was less consistent with the record as a whole than Dr. Munkberg's 2017 opinion, which was rendered without the bulk of the medical records. Rather, the ALJ, in a conclusory fashion, determined that Dr. Amusa's opinion was not consistent with some objectively normal examination findings in the record. Moreover, other than the conclusory statement that the ALJ considered the evidence in the record following the April 2017 opinion, it is not clear from the decision how the ALJ continued to afford this 2017 state agency opinion, which was the subject of the initial remand, significant weight after consideration of the other evidence.

The ALJ then found that Altland could perform her past work as an HR assistant. (Tr. 2071). Having reached these conclusions, the ALJ determined that

---

[2] Curiously, the ALJ's decision does not appear to consider the state agency opinion rendered in February of 2020, which found that Altland could perform a range of light exertional work. (See Tr. 2196-99).

Altland had not met the demanding showing necessary to sustain her claim for benefits and denied her claim. (Tr. 2071-72).

This appeal followed. (Doc. 1). On appeal, Altland challenges the adequacy of the ALJ's explanation of this RFC determination, arguing that the ALJ erred in his assessment of the medical opinion evidence. Specifically, Altland contends that the ALJ erred in assigning significant weight to Dr. Munkberg's 2017 opinion, which was rendered without the bulk of the medical evidence, and only partial weight to Dr. Amusa's opinion, which was the only opinion discussed that relied on the entirety of the medical record.

After consideration, we find that the ALJ failed to adequately articulate the basis for her RFC determination, specifically as it relates to the weight given to these various medical opinions. Accordingly, we conclude that the ALJ's burden of articulation has not been met in this case, and we will remand this case for further consideration by the Commissioner.

## III.   <u>Discussion</u>

### A.   <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the

record.  See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D.Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971).  A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966).  "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D.Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g., Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. <u>See Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

<u>Biestek</u>, 139 S. Ct. at1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. <u>See</u> <u>Arnold v. Colvin</u>, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence.") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford</u>, 399 F.3d at 552). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. <u>Id</u>. at 120; <u>see Jones v. Barnhart</u>, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." <u>Jones</u>, 364 F.3d at 505.

<u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B.       **Initial Burdens of Proof, Persuasion, and Articulation for the ALJ**

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a).   To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a).  To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process.   20 C.F.R.  §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC").   20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC).  RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e),  404.1545(a)(1),  416.920(e),  416.945(a)(1).   In  making  this assessment,  the  ALJ  considers  all  of  the  claimant's  medically  determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis.  20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once  the  ALJ  has  made  this  determination,  our  review  of  the  ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be

set aside if it is supported by substantial evidence. <u>Burns v. Barnhart</u>, 312 F.3d 113,

129 (3d Cir. 2002); <u>see also</u> <u>Metzger v. Berryhill</u>, No. 3:16-CV-1929, 2017 WL

1483328, at *5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub</u>

<u>nom. Metzgar v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21,

2017); <u>Rathbun v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D.

Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018

WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating

the existence of a medically determinable impairment that prevents him or her in

engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this

burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show

that jobs exist in significant number in the national economy that the claimant could

perform that are consistent with the claimant's age, education, work experience and

RFC.  20 C.F.R. §§404.1512(f), 416.912(f); <u>Mason</u>, 994 F.2d at 1064.

There is an undeniable medical aspect to an RFC determination, since that

determination entails an assessment of what work the claimant can do given the

physical limitations that the claimant experiences. Yet, when considering the role

and necessity of medical opinion evidence in making this determination, courts have

followed several different paths. Some courts emphasize the importance of medical

opinion support for an RFC determination and state that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller, 962 F.Supp.2d at 778–79 (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that "[t]here is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F.Supp.3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting, like that presented here, where well-supported medical sources have opined regarding limitations which would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In

21

this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when no medical opinion supports a disability finding or when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington, 174 F. App'x 6; Cummings, 129 F.Supp.3d at 214–15. In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113; see also Metzger v. Berryhill, 2017 WL 1483328, at *5; Rathbun v. Berryhill, 2018 WL 1514383, at *6.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d

Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Id. at 706-707.  In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding."  Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999).

## C.   Legal Benchmarks for the ALJ's Assessment of Medical Opinions[3]

Prior to March of 2017, the Commissioner's regulations set standards for the evaluation of medical evidence and define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

---

[3] The plaintiff filed her initial application in January of 2017, and filed a subsequent application in November of 2019, which were then consolidated on remand in October of 2020. As the Commissioner aptly notes, the Program Operation Manual System (POMS) directs that the ALJ is to use the regulations in effect at the time of the "earliest possible filing date" when an application involves two claims. Thus, we will assess this appeal through the lens of the pre-March 2017 regulations in effect at the time of the plaintiff's first filing in January of 2017.

In deciding what weight to afford competing medical opinions and evidence, the ALJ is guided by factors outlined in 20 C.F.R. §404.1527(c). "The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." SSR 96-6p, 1996 WL 374180 at *2. Treating sources have the closest ties to the claimant, and therefore their opinions generally entitled to more weight. <u>See</u> 20 C.F.R. §404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources..."); 20 C.F.R. §404.1502 (defining treating source). Under some circumstances, the medical opinion of a treating source may even be entitled to controlling weight. 20 C.F.R. §§04.1527(c)(2); <u>see also</u> SSR 96-2p, 1996 WL 374188 (explaining that controlling weight may be given to a treating source's medical opinion only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and it is not inconsistent with the other substantial evidence in the case record).

Where no medical source opinion is entitled to controlling weight, the Commissioner's regulations direct the ALJ to consider the following factors, where applicable, in deciding the weight given to any non-controlling medical opinions: length of the treatment relationship and frequency of examination; nature and extent of the treatment relationship; the extent to which the source presented relevant evidence to support his or her medical opinion, and the extent to which the basis for

the source's conclusions were explained; the extent to which the source's opinion is consistent with the record as a whole; whether the source is a specialist; and, any other factors brought to the ALJ's attention. 20 C.F.R. §404.1527(c). These benchmarks, which emphasize consideration of the nature of the treating relationship, also call for careful consideration of treating source opinions.

Indeed, this court has often addressed the weight which should be afforded to a treating source opinion in a Social Security disability appeals and emphasized the importance of such opinions for informed decision-making in this field. Recently, we aptly summarized the controlling legal benchmarks in this area in the following terms:

> Under applicable regulations and the law of the Third Circuit, a treating medical source's opinions are generally entitled to controlling weight, or at least substantial weight. See, e.g., Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 CFR § 404.1527(c)(2); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)). Oftentimes referred to as the "treating physician rule", this principle is codified at 20 CFR 404.1527(c)(2), and is widely accepted in the Third Circuit. Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993); See also Dorf v. Bowen, 794 F.2d 896 (3d Cir. 1986). The regulations also address the weight to be given a treating source's opinion: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case, we will give it controlling weight." 20 CFR § 404.1527(c)(2). "A cardinal principle guiding disability, eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on continuing observation of the patient's condition over a prolonged

period of time." <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000)
(citations omitted); <u>See also</u> <u>Brownawell v. Commissioner of Social
Security,</u> 554 F.3d 352, 355 (3d Cir. 2008). In choosing to reject the
treating physician's assessment, an ALJ may not make "speculative
inferences from medical reports and may reject a treating physician's
opinion outright only on the basis of contradictory medical evidence
and not due to his or her own credibility judgments, speculation, or lay
opinion." <u>Morales v. Apfel</u>, supra at 317.

<u>Morder v. Colvin</u>, No. 3:16-CV-213, 2016 WL 6191892, at *10 (M.D. Pa. Oct. 24,

2016).

Thus, an ALJ may not unilaterally reject a treating source's opinion and

substitute the judge's own lay judgment for that medical opinion. Instead, the ALJ

typically may only discount such an opinion when it conflicts with other objective

tests or examination results. <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 202–03

(3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the

treating source's medical opinion and the doctor's actual treatment notes justifies

giving a treating source opinion little weight in a disability analysis. <u>Torres v.

Barnhart</u>, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from a treating

source about what a claimant can still do which would seem to be well-supported by

the objective findings would not be entitled to controlling weight if there was other

substantial evidence that the claimant engaged in activities that were inconsistent

with the opinion." <u>Tilton v. Colvin</u>, 184 F.Supp.3d 135, 145 (M.D. Pa. 2016).

However, in all instances in social security disability cases the ALJ's decision,

including any ALJ judgments on the weight to be given to treating source opinions, must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter</u>, 642 F.2d at 704. Indeed, this principle applies with particular force to the opinion of a treating physician. <u>See</u> 20 C.F.R. §404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). "Where a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999) (quoting <u>Mason</u>, 994 F.2d at 1066)); <u>see also</u> <u>Morales</u>, 225 F.3d at 317. Therefore, the failure on the part of an ALJ to fully articulate a rationale for rejecting the opinion of a treating source may compel a remand for further development and analysis of the record.

It is against these legal benchmarks that we assess the instant appeal.

**D.   <u>This Case Will Be Remanded for Further Consideration by the Commissioner.</u>**

As we have noted, it is axiomatic that an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter</u>, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck</u>, 181 F.3d at 433. In the instant case, we conclude that the ALJ's RFC determination

27

is not supported by an adequate explanation, and we will remand the case for further proceedings.

In the instant case, the ALJ limited Altland to a range of sedentary work with some postural limitations. In making this determination, the ALJ gave significant weight to the April 2017 opinion of Dr. Munkberg and only partial weight to the 2021 opinion of Dr. Amusa. The ALJ reasoned that Dr. Munkberg's opinion was consistent with the record at the time the opinion was rendered, but further stated that she considered additional evidence since that 2017 opinion in crafting Altland's RFC. In giving only partial weight to Dr. Amusa's 2021 opinion—the only opinion in the record that considered the entirety of the medical evidence—the ALJ reasoned that this opinion was not consistent with normal objective findings in the record.

We find that this decision is not supported by substantial evidence. As we have noted, the opinion to which the ALJ gave significant weight was rendered in 2017 without the bulk of the medical records in this case. The plaintiff's initial application was denied but remanded with instructions to further evaluate the evidence in the record after this 2017 opinion was rendered and to take testimony from a medical expert regarding Altland's physical limitations. Dr. Amusa, after reviewing the entire record, opined that Altland was physically limited to a range of sedentary work with occasional postural limitations, but that she could never crouch

28

or crawl, and that she would be absent from work 2 days per month. Dr. Amusa's limitation that Altland could never crouch precluded her past work as an HR assistant, according to the Vocational Expert who testified at the supplemental hearing in this matter. The ALJ's reasoning for declining to adopt this limitation was that Dr. Amusa's opinion was inconsistent with normal examination findings. However, the decision does not explain how Dr. Amusa's limitations are inconsistent with the findings that post-date the April 2017 opinion. Indeed, as we have noted, Altland's treatment records after April 2017 contain many notations regarding abnormal physical examination findings, such as an antalgic gait, diminished range of motion, and pain in her lower extremities and lower back upon flexion and extension. (Tr. 1247, 1508, 1510, 1515, 2562, 2644, 2646, 2650, 2656, 2659, 2744, 2754, 3619).

While the ALJ was not required to unequivocally accept Dr. Amusa's limitations, the decision does not adequately explain how Dr. Amusa's limitations were inconsistent with these records showing abnormal physical examination findings throughout the relevant period, and significantly, after the April 2017 opinion was rendered. Moreover, the ALJ did not explain how Dr. Munkberg's 2017 opinion was consistent or inconsistent with these abnormal examination findings that post-dated the opinion. As we have explained, conflicts in the evidence must be

resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Cotter, 642 F.2d at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck, 181 F.3d at 433.

In this case, the ALJ afforded significant weight to an opinion rendered prior to the bulk of the medical evidence. The ALJ followed this course even though this case had been remanded once due to what was found to be erroneous reliance upon this opinion. The ALJ then afforded only partial weight to the only medical opinion which considered the entire medical record, reasoning that this opinion was inconsistent with normal objective examination findings. However, the decision fails to account for and explain the multitude of abnormal findings that post-dated the April 2017 opinion and does not sufficiently explain how those findings were inconsistent with Dr. Amusa's limitations that a vocational expert testified would preclude her past work. Since the ALJ found that Altland could perform her past work when denying her claim, given the failure to explain the weight given to these medical opinions in light of the medical evidence undermines confidence in this conclusion. Therefore, we cannot conclude that substantial evidence supports the RFC finding in this case.

30

In our view, more is needed by way of an explanation.  Since the ALJ's burden of articulation is not met in the instant case, this matter must be remanded for further consideration by the Commissioner. Yet, while we reach this result, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

## IV.   <u>Conclusion</u>

Accordingly, for the foregoing reasons, IT IS ORDERED that the plaintiff's request for a new administrative hearing is GRANTED, the final decision of the Commissioner denying these claims is vacated, and this case is remanded to the Commissioner to conduct a new administrative hearing.

An appropriate order follows.

<u>/s/ *Martin C. Carlson*</u>
Martin C. Carlson
United States Magistrate Judge

DATED: April 28, 2023